# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

RAYMOND F. HUNT,

       Plaintiff,

v.                                       CV 13-437 MCA/WPL

CAROLYN W. COLVIN, *Acting*
*Commissioner of the Social Security*
*Administration*,

       Defendant.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

Raymond Hunt filed an application for Supplemental Security Income ("SSI") on April 24, 2009. (Administrative Record ("AR") 23.) He alleges disability beginning June 1, 2006, due to bipolar disorder, scoliosis, severe depression, and arthritis. (AR 191.) Administrative Law Judge ("ALJ") Barry O'Melinn held a disability hearing on August 22, 2011. (AR 44-93.) On December 12, 2011, the ALJ determined that Hunt was not under a disability as defined by the Social Security Act and was therefore not entitled to benefits. (AR 23-38.) Hunt filed an appeal with the Appeals Council, but the Council declined his request, making the ALJ's decision the final decision of the Social Security Administration ("SSA"). (AR 1-7.)

Hunt sought review of the SSA's decision (Doc. 1) and filed an opposed Motion to Remand to Agency (Doc. 22). The Commissioner of the SSA ("Commissioner") responded (Doc. 23), and Hunt filed a reply (Doc. 24). After having read and considered the entire record and the relevant law, I recommend that the Court grant Hunt's motion and remand this case to the SSA for proceedings consistent with this opinion.

**STANDARD OF REVIEW**

In reviewing the ALJ's decision, the Court must determine whether it was supported by substantial evidence in the record and whether the correct legal standards were applied. *See Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (quoting *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007)). A decision is not based on substantial evidence if other evidence in the record overwhelms it or if there is only a scintilla of evidence supporting it. *Hamlin*, 365 F.3d at 1214 (quotation omitted). However, substantial evidence does not require a preponderance of evidence. *U.S. Cellular Tel. of Greater Tulsa, L.L.C. v. City of Broken Arrow, Okla.*, 340 F.3d 1122, 1133 (10th Cir. 2003). The Court must meticulously examine the record, but may neither reweigh the evidence nor substitute its discretion for that of the Commissioner. *See Hamlin*, 365 F.3d at 1214 (quotation omitted). The Court may reverse and remand if the ALJ has failed "to apply the correct legal standards, or to show us that []he has done so." *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

**SEQUENTIAL EVALUATION PROCESS**

The SSA has devised a five-step sequential evaluation process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003); 20 C.F.R. § 416.920(a)(4) (2014). At the first three steps, the ALJ considers the claimant's current work activity, the medical severity of the claimant's impairments, and the requirements of the Listing of Impairments. *See* 20 C.F.R. § 416.920(a)(4), & Pt. 404, Subpt. P, App'x 1. If a claimant's impairments are not equal to those in the Listing of Impairments, then, as part of step four, the ALJ determines the claimant's residual functional capacity ("RFC").   *See* 20 C.F.R. § 416.920(e).   The ALJ also compares the

claimant's RFC with the functional requirements of his past relevant work to see if the claimant is still capable of performing his past work. *See* 20 C.F.R. § 416.920(e). If a claimant is not prevented from performing his past work, then he is not disabled. 20 C.F.R. § 416.920(f). If the claimant cannot return to his past work, then the Commissioner must show at the fifth step that the claimant is capable of performing other jobs existing in significant numbers in the national economy. *See Thomas*, 540 U.S. at 24-25; *see also Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (discussing the five-step sequential evaluation process in detail). The claimant bears the burden of proof on the question of disability for the first four steps, and then the burden of proof shifts to the Commissioner at step five. *See Bowen v. Yuckert*, 482 U.S. 137, 146 (1987); *Talbot v. Heckler*, 814 F.2d 1456, 1460 (10th Cir. 1987).

### FACTUAL BACKGROUND

Hunt is a forty-eight-year-old man with an eighth-grade education. (AR 161, 197.) He worked intermittently as a butcher, stocker, and laborer. (AR 170-75, 192.) Hunt most recently worked as a butcher at a grocery store from July 2008 to January 2009. (AR 192.) He asserted that he stopped working because his hands swelled up and that he had to go to the emergency room for a ganglion cyst and carpal tunnel problems. (AR 191.)

Because Hunt's appeal is based on the ALJ's treatment of his psychological records, this section will focus more on Hunt's psychological history than on his physical ailments. The earliest records in the AR date back to 2005, when Hunt visited the Moore Chiropractic Center in Bald Knob, Arkansas. (AR 535-37.) On January 31, 2005, Hunt complained of neck pain, headaches, low back pain, and dizziness. (AR 536.) Notes interpreting an x-ray indicated that Hunt's left leg is about five millimeters shorter than his right leg, that Hunt has mild left cervicothoracic scoliosis with moderate left rotation of the upper thoracic vertebrae, and that

Hunt has moderate disc degeneration of C5-6. (*Id.*) Hunt failed to show for two appointments but did appear again for a December 6, 2005, appointment, complaining of pain or stiffness in his shoulders, low back, head, and neck. (AR 537.)

On January 11, 2007, Hunt visited Health Resources of Arkansas ("Health Resources") for a psychological assessment. (AR 286-92.) Hunt went to Health Resources for help with his mood because he thought that "it [was] his fault" that he could not get along with his wife. (AR 286.) Hunt reported irritability, occasional angry outbursts, depression, sad mood causing him to withdraw, decreased appetite, anxiety, paranoia, difficulty concentrating, and mood swings. (*Id.*) He was found to have a GAF of 50[1] and was diagnosed with Generalized Anxiety Disorder and recurrent, moderate Major Depressive Disorder. (AR 291.)

Hunt saw Deborah Ganus, L.A.C., at Health Resources on January 24, 2007, reporting no significant changes from his last visit. (AR 282.) Hunt had been crying that morning and at the session, his thoughts and speech were racing with excessive worry. (AR 282.) On February 21, 2007, Hunt saw Ganus again, also reporting no significant changes from his last visit and stating that he smokes marijuana to calm his nerves. (AR 281.) Ganus assessed Hunt with a GAF of 45 and scheduled him for sessions to work on improving his relationship and job skills. (*Id.*)

Hunt was seen at Health Resources on February 23, 2007, then assessed with osteoarthritis and a GAF of 47 and prescribed Lexapro. (AR 278-79.) He had a constricted affect and was depressed and anxious. (AR 278.) Ganus continued to work with Hunt on organizational

---

[1] The GAF is "a hypothetical continuum of mental health-illness" assessed through consideration of psychological, social, and occupational functioning. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR* 34 (4th ed., text rev. 2005). A score between forty-one and fifty is assessed when the patient is believed to have "[s]erious symptoms . . . OR any serious impairment in social, occupational, or school functioning." *Id.* Although the fifth edition of the *DSM* dropped the GAF rating in 2013 in favor of an alternative assessment schedule, Hunt's mental health providers used this scoring method.

skills and mood management. (AR 275.) At a July 10, 2007, visit with Ganus, Hunt stated that he was pleased with the Lexapro and that everyone noticed a difference in him. (*Id.*)

On January 8, 2009, Hunt went to the emergency room at Eastern New Mexico Medical Center ("ENMMC") with hand pain, for which he was diagnosed with carpal tunnel syndrome and a ganglion cyst in his right wrist. (AR 300.) The physician completed a work status report stating that Hunt could not return to work for seven days. (AR 305.) Hunt returned to ENMMC on January 16, 2009, with pain in his right wrist rated eight out of ten. (AR 312.) Hunt had his ganglion cyst aspirated and injected with .5cc of Kenalog. (*Id.*)

Hunt presented to the ENMMC emergency room on July 19, 2009, due to hearing voices for three to four days and for chronic neck pain. (AR 386.) Hunt made statements such as, "John the Baptist [is] coming down to see us." (*Id.*) Hunt's behavior was inappropriate, and he appeared anxious. (AR 390.) He was admitted to Sunrise Mental Health Center, the psychiatric unit of ENMMC. Diane Hamm, R.N., found that Hunt's consciousness was altered, that he maintained poor eye contact, and that he would not communicate with his caretakers. (*Id.*) On July 20, 2009, Hamm noted that Hunt had a flat affect and that he told a person on the telephone not to release the Bible to anyone but him. (AR 391.) Upon examination, Babak Mirin, M.D., found that Hunt was delusional, suicidal, and irritable, and he could not sleep. (AR 393.) Dr. Mirin discharged Hunt from ENMMC on July 23, 2009, once he was stabilized. (AR 384.) Dr. Mirin assessed Hunt with bipolar disorder and prescribed Depakote, Abilify, and Celexa. (*Id.*)

On November 7, 2009, Augustine Chavez, M.D., performed a disability determination examination. (AR 316-19.) Dr. Chavez noted that Hunt had a "very peculiar affect and strange interpersonal interactions." (AR 318.) However, Dr. Chavez also found that Hunt followed simple directions easily, appeared to have a normal mood and affect, and was appropriately

dressed and groomed. (*Id.*) With regard to physical problems, Dr. Chavez found that Hunt had reduced grip strength in his right hand and might have mild to moderate functional limitations with respect to prolonged lifting, carrying, or grasping with this hand. (*Id.*)

A November 24, 2009, case analysis by Samuel Palling, M.D., a state-agency, non-examining physician, revealed a medically determinable impairment characterized by a slight myopathy of unknown etiology in the right hand causing no severe limitations. (AR 320, 460.)

Carl B. Adams, Ph.D., performed a consultative psychological evaluation on December 1, 2009. (AR 321.) Dr. Adams found that Hunt's mood was stable and that he was able to attend and concentrate, make eye contact, and express himself well. (*Id.*) However, Hunt tended to talk at length and somewhat dramatically, and in so doing, add to his seemingly never-ending symptoms. (*Id.*) While Hunt complained of scoliosis and arthritis, Dr. Adams found that Hunt exhibited virtually no pain behaviors. (*Id.*) Hunt asserted that he had not smoked marijuana since July 2009. (AR 322.)

Dr. Adams determined that Hunt's long and short-term recall were in the low-average range, that his insight was grossly intact, and that he had poor psychological insight. (AR 321.) Dr. Adams found some of Hunt's stories "simply bizarre and unbelievable," outside of what would be considered "normal" hallucinations. (*Id.*) Hunt described a hallucination in which he saw a man in the clouds with a sickle, instructing Hunt to inform people of the "end times." (AR 322.) The man would write unknown biblical phrases on the wall with his finger. (*Id.*) Dr. Adams noted that this story sounded almost "scripted." (*Id.*)

Dr. Adams diagnosed Hunt with somatoform disorder, pain disorder with predominantly psychological factors, mood disorder, factitious disorder with predominantly psychological

factors, and personality disorder. (AR 323.) Dr. Adams found that Hunt had a GAF of 55 to 60.[2] As to functional limitations, Dr. Adams determined that Hunt has marked limitations with social interactions and moderate to marked limitations with concentration and task persistence. (*Id.*)

On December 16, 2009, psychiatrist Charles Mellon, M.D., performed a non-examining mental RFC assessment. (AR 325-28.) Dr. Mellon found that Hunt is moderately limited in the following abilities: to understand and remember detailed instructions, to carry out detailed instructions, to maintain attention and concentration for extended periods, to work in coordination with or proximity to others without being distracted by them, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to accept instructions and respond appropriately to criticism from supervisors, to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (AR 325-26.)

Dr. Mellon determined that Hunt suffers from mood disorder, pain disorder, somatoform disorder, factitious disorder, and personality disorder. (AR 332, 335-36.) Dr. Mellon found that Dr. Adams's finding of marked limitation in social interaction was not supported by the consultative exam. (AR 341.) Instead, Dr. Mellon found that Hunt has mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. (AR 339.) Based on these findings, Dr. Mellon's mental RFC indicated that Hunt can "understand,

---

[2] A score between fifty-one and sixty is assessed when the patient is believed to have "[m]oderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning." *Id.* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR* 34 (4th ed., text rev. 2005).

remember and carry out simple instructions, make simple decisions, attend and concentrate for two hours at a time, interact adequately with co-workers and supervisors and respond appropriately to changes in a routine work setting." (AR 327.)

On January 18, 2010, Hunt began mental health treatment at Counseling Associates. (*See* AR 408-10.) John Draper, Ph.D., noted that Hunt was referred to Counseling Associates by Sunrise Mental Health Center following his admission in late July 2009. (AR 410.) Hunt described his episodes of depression as typically lasting a day or two, with his manic symptoms lasting only a few minutes. (AR 408.) Dr. Draper found that Hunt was well-groomed, cooperative, and calm; that he had appropriate affect, euthymic mood, spontaneous speech, and focused thought processes; and that he experienced no delusions or suicidal or homicidal ideation. (AR 412.) Dr. Draper noted that Hunt is able to meet and get along well with others and otherwise socialize well (AR 419), and he found that Hunt had a GAF of 54 (AR 440). Dr. Draper recommended that Hunt participate in Counseling Associates' Psychoeducational Group, psychiatric services, and possible Comprehensive Community Support Services for controlling symptoms of bipolar disorder. (AR 410.) Hunt was to receive individual therapy every two weeks and group therapy weekly. (AR 427.) He was still receiving therapy as of May 2012, according to the last documentation in the AR from Counseling Associates. (*See* AR 435-37, 483, 487, 506, 533, 520, 522, 528, 541.)

On January 24, 2010, Hunt returned to Sunrise Mental Health Center for increased nervousness. (AR 351.) Molly Hunt, Hunt's mother, had called the police, who took him to the mental health center. (AR 354.) Hunt had not been on his medications since November 2009. (AR 351.) Nurses noted that Hunt's behavior was inappropriate and that he appeared anxious, nervous, and agitated, without the ability to cope properly. (AR 356.) Although Hunt denied that

he heard voices, he stated that he was prophesying. (*Id.*) While his blood was being drawn, Hunt clenched his fists and mumbled "kill her" over and over. (*Id.*) On January 31, 2010, Hunt was discharged in stable condition with a diagnosis of bipolar disorder after responding to psychiatric medication, nursing support, and group activities. (AR 349.)

Two additional state-agency, non-examining physicians evaluated Hunt's case. On May 24, 2010, Edward S. Bocian, M.D., affirmed Dr. Palling's November 24, 2009, case analysis. (AR 460.) Then, on June 25, 2010, Donald Gucker, Ph.D., affirmed Dr. Mellon's mental RFC. (AR 461.)

On July 27, 2010, Hunt saw Jessie Salazar, M.D., for primary care concerns, including pressure in his head, fatigue, facial and sinus pain, swollen glands, muscle aches, and earache. (AR 470.) Dr. Salazar assessed him with chronic sinusitis, scoliosis, and bipolar II disorder. (AR 469.) Dr. Salazar recommended a physical therapy consultation for posture, podiatry for shoes, and psychiatry for a head injury. (AR 470.) A CT scan on August 12, 2010, showed mild diffuse cortical atrophy. (AR 471.)

Hunt attended an initial physical therapy evaluation on August 17, 2010, to address poor posture, impaired trunk mobility, impaired lower extremity and scapular strength, and impaired functional mobility. (AR 475-76.) Hunt was discharged from physical therapy on September 1, 2010, because Hunt claimed that the physical therapy was not working and that he hurt worse with exercise. (AR 477.)

On June 29, 2011, Hunt was approved by the Abbott Patient Assistance Foundation to receive his medications free of charge for a year. (AR 500.)

Social worker David Martinez, LISW, who had been conducting group therapy sessions including Hunt once a week at Counseling Associates, completed a mental RFC assessment that

was signed by both Martinez and his supervisor, Robert H. Gervais, M.D. (AR 514-18.) Martinez noted that Hunt had reported a depressed mood throughout his treatment, and that he experienced an appetite disturbance and weight change; decreased energy; difficulty thinking or concentrating; psychomotor agitation or retardation; persistent nonorganic disturbance of vision, speech, hearing, use of a limb, movement and its control, or sensation; emotional withdrawal or isolation; and bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes. (AR 515.) Martinez further recorded that Hunt also reported increased tremors and physical pain. (AR 517.)

Martinez found that Hunt had a GAF of 54. (AR 514.) He determined that Hunt was unable to maintain regular attendance and be punctual within customary, usually strict tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being unduly distracted; complete a normal workday and workweek without interruptions from psychologically based symptoms; or perform at a consistent pace without an unreasonable number and length of rest periods. (AR 516.) Further, Hunt was seriously limited, but not precluded, from maintaining attention for a two-hour segment, making simple work-related decisions, asking simple questions or asking for assistance, and dealing with normal work stress. (*Id.*) Martinez opined that Hunt would have to be absent from work more than four days per month. (AR 518.) However, Martinez found that Hunt was unlimited or very good with interacting appropriately with the general public, maintaining socially appropriate behavior, and using public transportation. (AR 517.)

**HEARING TESTIMONY**

The ALJ held a hearing on August 22, 2011, at which Hunt, his mother Molly Hunt, and a Vocational Expert ("VE") testified. (AR 44-93.) Hunt was represented by an attorney at the hearing. (*See* AR 44.)

 Hunt testified that his mother drove him to the hearing because he cannot drive when he takes his medications. (AR 52.) He described his living situation, stating that he lives by himself in a camping trailer on the same property as his mother. (*Id.*) The ALJ asked about Hunt's work history. (*Id.*) While Hunt was the head butcher at his most recent job at a grocery store from July 2008 to January 2009, he was not in a supervisory position. (AR 53.) He testified that by the end, he could not even grip a knife because of a ganglion cyst, shaking, and carpal tunnel symptoms and that his boss told him to see a doctor. (AR 71, 77.) Hunt also previously worked for a year or less in various jobs including work as a butcher, stocker, welder trainee, furniture maker, and "doing odd jobs." (AR 53-56.) Hunt was incarcerated from November 1998 to November 1999 for a sexual abuse conviction and received five years of probation. (AR 57.) He violated his probation by moving to Arkansas at some time, testifying that he was sent there for treatment. (AR 58.)

Hunt testified that he did not work in 2002, 2003, or 2004 because of scoliosis, crepitus, lack of cartilage, and mental health. (AR 59-60.) He described his problems at the time of the hearing that affected his ability to work, explaining that, with his bipolar disorder, he cannot focus or concentrate, that he has tremors, and that his eyes blur. (AR 60.) Hunt had not seen a doctor about vision problems, however. (AR 60-61.) Regarding his bipolar disorder, Hunt testified that he first noticed problems in 2009, when he heard voices, saw visions, and thought

he was the messiah. (AR 61.) Hunt also testified that he still hears voices once in a while and that he believes that the blurred vision is caused by his bipolar medications. (AR 61-62.)

Hunt testified about his physical problems as well, including scoliosis, crepitus, lack of cartilage in his left shoulder, and constant pain in his neck. (AR 62-63.) He explained that he has trouble even carrying a gallon of milk and that he experiences tremors all over. (AR 66.) The ALJ asked about a recent assessment by Dr. Robert Gervais at Counseling Associates and learned from Hunt that Dr. Gervais never saw Hunt; instead Hunt went to counseling there with social worker David Martinez, while Dr. Gervais was a supervisor. (AR 67-68.) Hunt testified that he had seen Martinez about once a week for over a year and that the treatment had cleared a lot of the voices. (AR 68.)

Hunt testified that he seldom drinks and that he has not used marijuana since mid-2009. (AR 69-70.) His only friends are at counseling, and the only time he visits others is when people are at his mother's home. (AR 72.) As a child, he always thought that people were out to get him, and he has depended on his family his entire life. (AR 76.) Hunt stated that he takes Trazodone to help him sleep, that he has lost a significant amount of weight, and that he feels so weak that it can take him two or three days to mow a quarter of an acre of grass. (AR 72-73.) The ALJ noted that Hunt's hand shook about an inch when he picked up an envelope with an inch of papers. (AR 77.) His mother goes grocery shopping for him. (AR 73-74.) Hunt testified that he could not handle a job in his condition. (AR 75.)

Molly Hunt testified that her son experiences tremors that can be so bad that his cereal falls off of his spoon, struggles even to mow the lawn over two days, might not even be able to handle a cellular phone, and has a lot of physical and mental problems. (AR 80-81, 87-88.) She noted that she had to call the police one time when Hunt was beating his leg without realizing it

and talking to someone who was not there. (AR 81.) Molly stated that Hunt cannot drive when he takes his medicine. (AR 81.) However, she testified that his bipolar disorder stays under control when Hunt takes his medicine. (AR 83.) Nonetheless, Molly testified that Hunt has trouble with concentration and will change the subject in conversation without realizing it. (AR 85.) Molly also sometimes sets his medicine out for him and checks to see that he has taken his medicine if he is not acting right. (AR 86.)

The ALJ next questioned the VE. (AR 89-92.) The ALJ asked the VE to assume a person of Hunt's age, education, and work history who is able to perform work at the light exertional level and who can only occasionally climb ramps or stairs; can never climb ladders, ropes, or scaffolds; can only occasionally balance, stoop, kneel, crouch, and crawl; must avoid concentrated exposure to operational controlled moving machinery, unprotected heights, and exposure to hazardous machinery; is limited to work consisting of simple, one or two-step tasks; can respond appropriately to supervision, coworkers, and work situations; can deal with changes in a routine setting; can remember work-like procedures; can maintain concentration, persistence, and pace for two hours at a time; and can maintain regular attendance and punctuality. (AR 90-91.) The VE testified that such a person could not perform Hunt's past work. (AR 91.) However, the VE also testified that such a person could perform the jobs of laundry folder, advertising material distributor, and shipping and receiving weigher, which exist in significant numbers in the national or regional economy. (*Id.*) The VE also stated that if a person in one of these jobs was absent two days a month for the first month, he would be fired. (*Id.*) Such a person would also be unable to maintain competitive employment if he could not maintain concentration, persistence, and pace for two hours. (AR 91-92.)

### THE ALJ AND APPEALS COUNCIL'S DECISIONS

The ALJ reviewed Hunt's application for benefits according to the sequential evaluation process. (AR 25-37.) At the first step, the ALJ found that Hunt had not engaged in substantial gainful activity since April 24, 2009, the application date. (AR 25.) Then, at the second step, the ALJ concluded that he suffers from the severe impairments of scoliosis, osteoarthritis, neck pain, somatoform disorder, factitious disorder, and bipolar disorder. (*Id.*) At step three, the ALJ found that Hunt's combination of severe impairments did not equal one of the listed impairments. (AR 26.) In making this determination, the ALJ explained that he found that Hunt has only mild restriction in activities of daily living. (AR 27.) Further, the ALJ concluded that Hunt suffers from only mild difficulties in social functioning. (*Id.*) The ALJ cited to Hunt's statement to counselors at Counseling Associates that he socializes well with others and does not have trouble meeting new people; Hunt's mother's assertion that Hunt does not get along well with others but enjoys playing music for people; Drs. Adams and Chavez's observations that Hunt had a "very peculiar affect" and tended to "talk at length;" and a mental RFC assessment from July 26, 2011, from Counseling Associates stating that Hunt has no limitations in dealing with the general public, maintaining socially acceptable behavior, or using public transportation. (*Id.*) The ALJ also found that Hunt has moderate difficulties with concentration, persistence, or pace. (*Id.*)

As part of step four, the ALJ then determined that Hunt had an RFC equivalent to the hypothetical set of abilities posed to the VE at the hearing testimony, with the addition that Hunt can make simple work-related judgments and decisions. (AR 28.)

The ALJ summarized Hunt's hearing testimony and the medical record. (AR 29-35.) The ALJ noted that he did not give any weight to unsigned chiropractic records that cited to x-ray reports that were not included in the record. (AR 35.) He also found Hunt was not completely

14

credible because Hunt violated his probation by going to Arkansas on his own accord, while Hunt testified that he was "sent" to Arkansas for treatment. (*Id.*) The ALJ then stated that he questioned Hunt's credibility because Hunt's description of his hallucinations sounded "almost scripted" to Dr. Adams, because he worked only sporadically prior to his alleged disability onset date, and because Hunt testified that he stopped working due to mental impairments rather than as a result of a ganglion cyst reflected by the record. (*Id.*) The ALJ also gave minimal weight to the opinion of social worker Martinez, whose mental RFC assessment was signed by Dr. Gervais, because Martinez appeared to rely heavily on the subjective reports of symptoms and limitations provided by Hunt, the opinion was conclusory, neither Martinez nor Dr. Gervais had the opportunity to review the other medical reports in the current record, and Dr. Gervais signed the opinion without ever examining Hunt. (AR 36.) On the other hand, the ALJ accorded "great weight" to the opinions of Drs. Adams and Chavez, finding their opinions to be well-supported. (*Id.*)

The ALJ concluded that Hunt could not perform past relevant work. (AR 36.) Nonetheless, at step five, the ALJ found that considering Hunt's age, education, work experience, and RFC, and the testimony of the VE, Hunt could perform the work of a laundry folder, advertising material distributor, and shipping and receiving weigher. (AR 37.) As the ALJ determined that Hunt could perform jobs existing in significant numbers in the national economy, the ALJ concluded that Hunt was not disabled. (AR 37-38.) Hunt appealed the decision to the Appeals Council, but the Council found that Hunt's reasons for disagreeing with the hearing outcome did not justify a review of the ALJ's decision, thereby rendering the ALJ's decision the final decision of the Commissioner. (AR 1-7.)

**DISCUSSION**

Hunt argues that the ALJ erred by failing to provide reasons for accepting some parts of medical opinions and rejecting other parts. Specifically, Hunt argues first that the ALJ failed to adequately explain his reasons for rejecting Dr. Adams's opinions that Hunt had moderate to marked limitations with concentration and task persistence and marked limitations with social interaction. Second, he argues that the ALJ erred by providing no reason for relying on the opinions of Martinez at step three of the sequential evaluation process and totally rejecting his opinions at steps four and five. Finally, Hunt argues that the ALJ's reasons for rejecting Martinez's opinions are not supported by substantial evidence. Because I recommend that the Court find that the ALJ erred with respect to the first two arguments, I do not reach the third.

## I.      Treatment of Dr. Adams's Opinion

Hunt highlights that the ALJ noted the limitations listed by Dr. Adams and stated that he gave Dr. Adams's opinion "great weight" at step four with regard to the presence and severity of Hunt's medical impairments. Nonetheless, Hunt points out that the ALJ found at step three that Hunt has only moderate limitations in concentration, persistence, or pace and only mild difficulties in social functioning, despite Dr. Adams's more restrictive findings. Hunt acknowledges that the ALJ provided a bullet-point list of Dr. Adams's findings of limitations in step four, but asserts that "the list was devoid of analysis." Hunt argues that the ALJ was required to either adopt or reject Dr. Adams's opinions in their entirety or explain why he adopted some of the opinions and not others.

The Commissioner argues that the ALJ considered the entire record, including Dr. Adams's opinion, and that the weight given to a medical opinion depends on the extent to which competent medical findings support that opinion and the opinion is consistent with other

16

evidence. The Commissioner contends that the ALJ drew appropriate inferences from the evidence and explained how he determined that Hunt had mild limitations in social functioning and moderate limitations in concentration, persistence, or pace. While the Commissioner notes that the ALJ could have been more explicit in his explanations, the Commissioner argues that a technical omission[3] in an ALJ's reasoning does not require remand.

"The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). On the other hand, "[a]n ALJ is not entitled to pick and choose through an uncontradicted medical opinion, taking only the parts that are favorable to a finding of nondisability." *Haga v. Astrue*, 482 F.3d 1205, 1208 (10th Cir. 2007) (citation omitted). In *Haga*, the court remanded the case because the ALJ failed to explain why he rejected four of the moderate restrictions provided in a consulting doctor's mental RFC assessment, while seemingly adopting others. *Id.* Likewise, in *Wilson v. Colvin*, the court found that if the ALJ intended to omit certain moderate restrictions determined by a consulting doctor, while adopting others, he should explain his reasons for doing so. 541 F. App'x 869, 873-74 (10th Cir. 2013) (unpublished).

In contrast, the court found *Haga* distinguishable where an ALJ declined to adopt a consulting physician's opinion regarding the claimant's ability to respond to changes in a work setting, yet the ALJ specifically mentioned the treating physician and non-examining physician's opinions that controverted that of the consulting physician. *Wheeler v. Astrue*, No. 11-CV-366-CVE-FHM, 2012 WL 4093762 (N.D. Okla. Aug. 17, 2012), *report and recommendation*

---

[3] Merely technical omissions in the ALJ's analysis do not constitute reversible error where the Court can follow the ALJ's reasoning and determine that the correct legal standards have been applied. *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1166 (10th Cir. 2012).

*adopted*, No. 11-CV-366-CVE-FHM, 2012 WL 4092424 (N.D. Okla. Sept. 17, 2012) (unpublished). That is, "[w]hen opinions are not uncontradicted entirely, the ALJ must provide a valid reason for choosing one opinion over another to the extent the opinions differ." *Rischer v. Colvin*, No. 13-CV-4045-DDC, 2014 WL 3611678, at *14 (D. Kan. July 22, 2014) (citing *Quintero v. Colvin*, No. 13-1396, 2014 WL 2523705, at *4 (10th Cir. 2014)). "[T]o the extent there are differences of opinion among the medical sources, the ALJ must explain the basis for adopting one and rejecting another, with reference to the factors governing the evaluation of medical-source opinions . . . ." *Reveteriano v. Astrue*, 490 F. App'x 945, 947-48 (10th Cir. 2012) (unpublished) (citation omitted). These factors are found in 20 C.F.R. § 416.927(c)-(e) and consider the examining relationship and the treatment relationship, including length of the treatment and frequency of examination, the nature and extent of the treatment relationship, supportability, consistency, specialization, and other factors. These factors apply to the consideration of medical opinions from "acceptable medical sources" who are not treating sources given controlling weight and "all opinions from medical sources who are not 'acceptable medical sources' as well as from 'other sources,' . . . who have seen the individual in their professional capacity." Social Security Ruling ("SSR") 06-03p, 2006 WL 2329939, at *4 (Aug. 9, 2006).[4]

The Commissioner argues that non-examining Drs. Mellon and Gucker contradicted Dr. Adams's finding that Hunt has marked limitations in social functioning. However, the ALJ never mentioned either Dr. Mellon or Dr. Gucker in his decision. The ALJ's only mention whatsoever

---

[4] SSRs are binding on the SSA, and while they do not have the force of law, courts traditionally defer to SSRs since they constitute the agency's interpretation of its own regulations and foundational statutes. *See Sullivan v. Zebley*, 493 U.S. 521, 531 n.9 (1990); 20 C.F.R. § 402.35; *see also Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1051 (10th Cir. 1993) (SSRs entitled to deference).

of state-agency, non-examining doctors was a statement at step four that these doctors' opinions supported a determination of "not disabled" and that the opinions deserved some weight. Nowhere in his decision did the ALJ state whether there was any evidence that explicitly conflicted with Dr. Adams's opinions. *See Haga*, 482 F.3d at 1208 ("Although the government is correct that the ALJ is entitled to resolve any conflicts in the record, the ALJ did not state that any evidence conflicted with [a particular doctor's] opinion or mental RFC assessment."). Despite the Commissioner's post-hoc arguments in support of the ALJ's decision, the ALJ himself must reference those parts of the AR that support his conclusions. *Krauser v. Astrue*, 638 F.3d 1324, 1331 (10th Cir. 2011) (citing *Hamlin*, 365 F.3d at 1217). The only point at which the ALJ even hinted at an opinion that conflicted with that of Dr. Adams was in his step three discussion where the ALJ noted that Drs. Adams and Chavez found Hunt to have a very peculiar affect and that he talked at length,[5] yet Martinez's mental RFC assessment indicated that Hunt had no limitations maintaining socially acceptable behavior. Nonetheless, the ALJ did not recognize in the step-three discussion Dr. Adams's finding of marked social limitations or discuss, with reference to the factors governing the evaluation of medical-source opinions, why he rejected Dr. Adams's opinion on social interactions in favor of potentially conflicting evidence.

Furthermore, the ALJ did not explain how he found that Hunt has moderate difficulties with regard to concentration, persistence, or pace, despite Dr. Adams's opinion that Hunt has moderate to marked limitations with concentration and task persistence and Dr. Mellon's opinion that Hunt has only mild difficulties in maintaining concentration, persistence, or pace. Again, the

---

[5] Dr. Chavez noted that Hunt had a "very peculiar affect and strange interpersonal interactions" (AR 318), while Dr. Adams found that Hunt "tended to talk at length and, as he did, added a plethora of symptoms that seemed never ending" (AR 321).

ALJ did not mention Dr. Mellon's opinion or any other explicitly controverting opinions as to Hunt's limitations regarding concentration, persistence, or pace. The ALJ merely noted at step three that Hunt's mother stated that Hunt has difficulty paying attention, that he abruptly changes the topic of conversation, and that he needs help remembering to take his medications properly. There is no discussion of why the ALJ declined to adopt Dr. Adams's opinion.

Because the ALJ failed to explain in his RFC assessment why he did not adopt Dr. Adams's findings that Hunt experiences marked difficulties in social functioning and moderate to marked limitations with concentration and task persistence, I recommend that the Court remand this case for further proceedings consistent with this opinion.

## II.    Treatment of Martinez's Opinion

Hunt also argues that the ALJ committed reversible error in picking and choosing from among Martinez's opinions without providing a reason for the varied treatment. Hunt recognizes that the ALJ conferred "minimal weight" to Martinez's opinions regarding the presence and severity of Hunt's medical impairments. Hunt asserts that Martinez's opinions "significantly conflict" with the ALJ's RFC determinations that Hunt can respond appropriately to supervision, co-workers, and work situations; deal with changes in a routine work setting; maintain concentration, persistence, and pace for two-hour increments; and maintain regular attendance and punctuality. While declining to adopt those of Martinez's opinions that supported a finding of disability, Hunt argues, the ALJ explicitly relied on Martinez's opinion that Hunt had unlimited or very good abilities with regard to interacting appropriately with the general public, maintaining socially acceptable behavior, and using public transportation. Hunt argues that absent an explicit explanation for the different treatment of opinions from the same medical provider, the ALJ committed reversible error.

The Tenth Circuit has found reversible error where "the ALJ fully discounted the bulk of [a medical provider's] mental RFC limitations with no explanation at all as to why one part of his opinion was creditable and the rest was not." *Chapo v. Astrue*, 682 F.3d 1285, 1292 (10th Cir. 2012). As discussed in the previous subsection, when "there are differences of opinion among the medical sources, the ALJ must explain the basis for adopting one and rejecting another, with reference to the factors governing the evaluation of medical-source opinions." *Reveteriano*, 490 F. App'x at 947 (citation omitted). A licensed clinical social worker, such as Martinez, is not considered an "acceptable medical source." SSR 06-03p, 2006 WL 2329939, at *4. However, the factors in 20 C.F.R. § 416.927(c) apply to both acceptable and not acceptable medical sources alike. The ALJ failed to reference the factors governing the evaluation of medical-source opinions to explain why he applied Martinez's opinion as to Hunt's ability to maintain socially acceptable behavior when he accorded "minimal weight" to the remainder of Martinez's opinions. Furthermore, "it is inconsistent for an ALJ to use certain opinions as support for his decision while simultaneously giving 'little weight' to the same opinions." *Rischer*, 2014 WL 3611678, at *14 (citing *Quintero*, 2014 WL 2523705, at *4). I therefore recommend that the Court remand the case on this basis as well so that the ALJ may articulate why he appeared to accord greater weight to Martinez's opinion on Hunt's social functioning as opposed to his other opinions.

## CONCLUSION

I recommend that the Court find that the ALJ erred in determining that Hunt suffers from only mild difficulties in social functioning and moderate difficulties with concentration, persistence, or pace without explaining how he reached a conclusion contrary to Dr. Adams's opinion. Further, I recommend that the Court find that the ALJ also erred in applying, without

21

explanation, Martinez's opinion regarding social functioning to find that Hunt suffers from only mild difficulties in social functioning, while at the same time according minimal weight to Martinez's opinions that might support a disability. I therefore recommend that the Court remand this case to the SSA so that the ALJ may reevaluate his treatment of the medical sources and for other proceedings consistent with these proposed findings.

_William P. Lynch_

William P. Lynch
United States Magistrate Judge

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any pro se
party as they are shown on the Court's docket.